**In re Donnie Lee MAHONEY, Debtor.**

**Bankruptcy No. 84–02983–LM11.**

United States Bankruptcy Court,
S.D. California.

Dec. 1, 1987.

Robert L. Rentto, Stutz, Rentto, Gallagher & Artiano, San Diego, Cal., for debtor.

L. Scott Keehn, Robbins & Keehn, San Diego, Cal., for Chalet & Assoc.

## MEMORANDUM DECISION

LOUISE DeCARL MALUGEN, Bankruptcy Judge.

Donnie Lee Mahoney, a Chapter 11 debtor, seeks confirmation of his plan of reorganization. Confirmation of the plan is opposed by the Internal Revenue Service and Chalet & Associates, an unsecured creditor.

1. Unsecured creditors holding claims totaling $32,353,823 have voted on Mahoney's plan. The single largest unsecured creditor—Bader Finan-

This controversy is a core matter pursuant to 28 U.S.C. § 157(b)(2)(L).

## PLAN SUMMARY

Mahoney's Chapter 11 plan is to transfer his assets, including real property, promissory notes, partnership interests and $69,500 in cash, to a new corporation called D.L.M., Inc. Mr. Mahoney will then devote his services to the corporation for five years, "work the assets"—that is, develop and sell real property in Washington, liquidate the other assets, invest all cash proceeds received either in commercial satellite systems/mini cable systems or in the purchase of factored accounts receivable, and distribute the increased assets to creditors at the conclusion of the plan. Mahoney projects that the reorganized debtor D.L.M., Inc., will take assets currently worth $282,603 and parlay them into assets worth $391,915. There is no guarantee of the results projected by D.L.M., Inc.; however, Mahoney pledges to utilize his best efforts on behalf of D.L.M., Inc., to achieve them.

Under the plan of reorganization, D.L.M., Inc., will hire Mahoney as its president for a five-year term during which he will spend "as much time as needed by this new corporation up to seventy-five percent of his time" conducting its business. He is to be paid a salary of $1,500 per month for the first year, which salary will increase $500 per year during each of the four succeeding years. Additionally, at the plan's conclusion, he is to receive 15% of the net assets generated by D.L.M., Inc., either in cash or upon liquidation, depending upon whether the shareholders of the new corporation elect to continue the corporate existence or dissolve the corporation.

The corporate shareholders of D.L.M., Inc., will be Mahoney's unsecured creditors. D.L.M., Inc., will have a board consisting of three members—one to be elected by the largest unsecured creditor/shareholder,[1] one by all other unsecured creditors and Mahoney. The plan provides that

cial Services—which is owed $19,333,333, will elect one director to D.L.M.'s board under Mahoney's plan.

Mahoney will serve a five-year term as a member of the board. The other two directors will serve two-year terms and then must stand for re-election.

## VOTING PROCEDURE

When confirmation of this plan first came up for consideration, creditor objection was raised to the validity of the voting procedure used by the debtor. It appears that the debtor circulated a disclosure statement without Exhibits "A" and "B" which were the financial projections supporting the disclosure statement. The disclosure statement approved by the Court for circulation to creditors required those exhibits to be attached. Additionally, the debtor created some confusion by circulating a notice of the confirmation hearing, indicating that ballots had to be received on or before May 15, 1987, although acceptances or rejections of the plan could be filed as late as June 11, 1987.

Since the debtor failed to reserve sufficient time for a contested confirmation hearing, the confirmation hearing could not go forward on the day initially scheduled in any event. Because of the substantial delay in having an evidentiary hearing concerning confirmation, the debtor elected to re-notice the confirmation hearing, circulate a corrected disclosure statement and re-ballot creditors. This was a voluntary act of the debtor and not required by the Court which had not ruled on the validity of the notice objections.

■ Chalet had timely objected to confirmation initially. Mahoney challenges Chalet's standing to be heard in opposition to his plan since Chalet did not refile its objections in response to the amended notice of confirmation hearing.

This Court finds that because re-balloting and sending amended confirmation hearing notices were voluntary acts of the debtor and not taken at the direction of the Court, Chalet's previously filed rejection of the debtor's plan and objections filed thereto should be deemed part of the record to be considered in confirmation of the debtor's plan. Mahoney has had adequate notice of the nature of the objections raised by Chalet and cannot claim prejudice or unfair surprise by the Court's consideration of those objections.

## PLAN OBJECTIONS

The Internal Revenue Service objects to the treatment of priority tax claims in Mahoney's plan. First, Mahoney does not specify an interest rate, if any, to be paid on the deferred portion of the priority tax claims. The IRS requests this Court apply the interest rate set by 26 U.S.C. § 6621 to the unpaid taxes. Further, the IRS objects to this debtor's failure to provide for payment of the delinquent taxes in installments. Although not specific on this point, Mahoney's plan appears to provide that priority tax claims will be paid in a lump sum during the last month of this five-year plan.

Mahoney counters, arguing that the IRS is not entitled to receive interest at the rate specified in 26 U.S.C. § 6621. Further, Mahoney claims that § 1129(a)(9), "gives the debtor the absolute right to stretch out priority unsecured tax claims for a period not to exceed six years from the date of assessment." (Response to Objection of Internal Revenue Service filed September 24, 1987, page 3).

■ The IRS' objections to these provisions of the debtor's plan are persuasive. First, the recent case of *In re Camino Real Landscape Maintenance Contractors,* 818 F.2d 1503 (9th Cir.1987), held that the interest rate set by 26 U.S.C. § 6621 was not necessarily the interest rate required by 11 U.S.C. § 1129(a)(9). However, the court also stated that if the delinquent tax rate tracked market interest rates, the § 6621 rate might be considered. In this case, the debtor made no effort to assign an interest rate to the deferred taxes and has introduced no evidence of market interest rates. The current § 6621 rate of 9% appears to this Court to be a rate of interest which this debtor might be required to pay were it borrowing a similar sum of money on the commercial loan market; in fact, it is in all likelihood much more favorable. Accordingly, the debtor's plan may

not be confirmed unless it provides for interest on the deferred taxes equal to the rate set by 26 U.S.C. § 6621 as of the effective date of the plan.

 Further, the IRS' citation to the recent decision in *In re Mason & Dixon Lines, Inc.*, 71 B.R. 300, 15 B.C.D. 930 (Bankr.M.D.N.C.1987) although not controlling, is persuasive on the question of whether the debtor should be required to make monthly cash payments. In that case, the court held that periodic payments of a reasonable interval were required unless the debtor could present special facts or circumstances which required a different payment schedule. This debtor has presented no evidence of such circumstances. Accordingly, monthly payments commencing 30 days after entry of a final order adjudicating the claims of the IRS will be required as a condition precedent to confirmation of this plan.

Chalet & Associates has filed extensive objections to the confirmation of Mahoney's plan, which may be summarized as follows:

1. The corporate structure of the reorganized debtor D.L.M., Inc., violates California corporations law.

2. The plan violates the best interests test of 11 U.S.C. § 1129(a)(7)(A)(ii) because it is speculative and there is no evidence that creditors will receive more from the plan than from a Chapter 7 liquidation. Further, Chalet urges that a mixed best interests/feasibility problem is raised by Mahoney's development plans for real property in Washington, which is the capstone of his plan.

3. The plan is not feasible as required by § 1129(a)(11) because Mahoney has failed to properly calculate the tax effect of the proposed operations of D.L.M., Inc., and thereby underestimated taxes due from the reorganized debtor.

4. Finally, Chalet objects to confirmation on the grounds that Mahoney's retention of an interest in 15% of the assets to be distributed at the conclusion of the plan violates the absolute priority rule contained in § 1129(b)(2)(B)(ii).

These objections will be addressed *seriatim.*

1. *California corporations law violation:* Article V, para. 5.1.A of the debtor's plan of reorganization provides that the board of D.L.M., Inc.,

> ... [S]hall consist of three members. One director shall be elected by the largest shareholder in the Reorganized Debtor; one director shall be elected by all other shareholders of the Reorganized Debtor; and the debtor shall serve as or otherwise appoint the third director.

The plan further provides in subparagraph E of the same section that, "The largest shareholder shall again be entitled to elect one director, and all other shareholders shall be entitled to elect the other director." Chalet objects to this provision as the debtor's attempt to create multiple classes of shareholders, while issuing only a single class of stock.

California Corporations Code § 708(a) states:

> Every shareholder ... may cumulate such shareholder's votes and give one candidate a number of votes equal to the number of directors to be elected multiplied by the number of votes to which the shareholder's shares are entitled, or distribute the shareholder's votes on the same principle among as many candidates as the shareholder thinks fit.

Without creating separate classes of stock, the debtor's plan restricts the rights of certain shareholders to vote for all directors who may be candidates at a given election; clearly, a violation of California's cumulative voting provision.

Article V, para. 5.1.B of the debtor's plan provides the following terms for the directors of D.L.M., Inc.:

> The debtor shall serve a five-year term as a member of the Board of Directors. Each of other director shall serve an initial term of two years and until his respective successor shall have been elected and duly qualified.

Chalet contends that this plan provision violates California Corporations Code § 301(a) which requires: "At each annual

meeting of shareholders, directors shall be elected to hold office until the next annual meeting." Chalet objects that the staggered terms and the debtor's attempt to establish a "directorship for life" for himself, violate California Corporations Code § 301(a)'s mandate of annual election for directors.

The debtor counters that this Court may confirm the plan despite these apparent violations of California corporations law because of the broad language of 11 U.S.C. § 1123(a), which permits a plan to provide for adequate means of its implementation by transfer of assets to a new entity or issuance of securities in a new entity in exchange for claims, regardless of any other applicable non-bankruptcy law. The debtor also refers to 11 U.S.C. § 1142(a) which provides:

> Notwithstanding any otherwise applicable non-bankruptcy law, rule or regulation relating to financial condition, the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan, and shall comply with any orders of the court.

Finally, the debtor says that his plan does not violate California corporations law because California Corporations Code § 1400 gives a California corporation reorganizing under the Bankruptcy Code "... wide latitude in formulating and implementing a plan of reorganization, including to do virtually anything to establish a plan of reorganization." (Response to Objections to Confirmation filed June 22, 1986, pg. 9).

This Court disagrees with the debtor's contentions that it is protected either by 11 U.S.C. §§ 1123(a) and 1142 or California Corporations Code § 1400. First, while § 1123(a)(5) authorizes the creation of a corporation to which the debtor's assets could be transferred and § 1123(a)(6) gives this newly-formed corporation wide latitude in structuring the distribution of voting power among classes of security holders, § 1123(a) also requires the plan to ...:

> ... [C]ontain only provisions that are consistent with the interests of creditors

and equity security holders *and with public policy with respect to the manner of selection of any officer, director, or trustee* under the plan and any successor to such officer, director, or trustee. [emphasis added] [§ 1123(a)(7)]

The meaning of § 1123(a)(7) is far from clear. The provision is derived substantially from former § 216(11) of the Bankruptcy Act [11 U.S.C. § 616(11) repealed] and was adopted without much comment into the Bankruptcy Code. Unfortunately, former § 216(11) was not itself a model of clarity. When attempting to describe the meaning of that section, one commentator said:

> It requires that the "manner of selection" of directors, officers or voting trustees, upon the consummation of the plan, and their respective successors, be "equitable, compatible with the interests of creditors and stockholders, and consistent with public policy." The Senate Committee saw in this Section a design, "for example, to insure adequate representation of those whose investments are involved in the reorganization. In its negative aspects, the Section appears to be aimed at control by those whose investment in the enterprise is very small.... The broad criteria of these sections shed little light." M. Krotinger, "Management And Allocation Of Voting Power In Corporate Reorganizations," 41 Colum.L.Rev. 646, 665 (1941).

■ California Corporations Code § 708(a) providing for cumulative voting and § 301(a) requiring annual election of directors are strong expressions of this state's concern that corporations act democratically. Admittedly, § 1123(a)(7) does not state whose public policy (federal, state or local) should not be violated by a plan of reorganization. However, absent advancement by the debtor of any compelling reason why the proposed corporate form must violate California's corporations laws, this Court declines to confirm a plan which disregards California's public policy as embodied in these corporations code sections.[2]

---

**2.** Although the debtor's plan is silent, the Court

has assumed the debtor intends to incorporate

Further, California Corporations Code § 1400 does not authorize creation of a corporate entity as proposed by the debtor. That section merely provides that an existing corporation which files for reorganization under the Bankruptcy Code may amend its articles of incorporation or by-laws to effectuate the terms of a plan of reorganization without board or shareholder approval. Nothing in § 1400 authorizes the creation of a new entity violative of existing California corporations law.

Accordingly, the debtor's plan fails to satisfy § 1123(a)(7) and thereby violates § 1129(a)(1) requiring the plan to comply with the applicable provisions of Title 11.

■ 2. *The plan is not feasible and violates the best interests test:* Chalet contends that the debtor's plan is illusory and speculative and that nothing has been promised which guarantees creditors would receive more through the plan than from a Chapter 7 liquidation. Further, Chalet questions the debtor's ability to develop the Washington real property, which is the primary method of funding his plan. The Court finds Chalet's objection well-taken and denies to confirm on this ground as well.

As stated above, Mahoney's plan is to "work the assets." Specifically, he intends to subdivide one acre of waterfront land on Bainbridge Island, Washington, into two building lots, build a residence on one of those lots, sell the residence for a profit, paying off the existing trust deed and any construction loan from that sale. This apparently would leave the second lot debt-free to be sold with the proceeds to be invested by Mahoney. On cross-examination, Mahoney admitted that he has not prepared a construction budget for the project, has not done a market survey, and

has not approached any lenders to determine their willingness to lend to a newly-formed corporation. Further, Mahoney does not plan to relocate in Washington, but rather intends to supervise by proxy through his brother, who is employed full-time as a vice-president for a major corporation, but lives only one-half mile from the project.

Chalet's skepticism over the feasibility of this development plan is justified. As observed by the court in *In re Bergman*, 585 F.2d 1171, 1179 (2d Cir.1978), the feasibility test contemplates:

... [T]he probability of actual performance of the provisions of the plan. Sincerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.

The debtor has the burden on the issue of feasibility and with respect to the development of the Washington property, has not met it.

When questioned regarding his plans for liquidation of other assets, his strategy for most of them appears to be to hold the assets until a more favorable time to liquidate them. The Topaz II and the Kearny Mesa Pro Shop promissory notes are to be collected; the Tallman condominium is to be sold at the earliest date; the Olympic partnership investment is to be held for a few more years. The only assets other than the Washington real property which require Mahoney's personal involvement to liquidate are the Ultronics promissory notes.

Ultronics is a corporation in which Mahoney has a 25% shareholder interest. It is currently insolvent, meeting its cash flow by borrowing from the 75% shareholder.

under the laws of the State of California. Mahoney's plan merely states that, "... the articles of incorporation and bylaws for D.L.M., Inc., in the standard form shall be filed and adopted." Even if the debtor intends to incorporate under a foreign corporation law, California Corporations Code § 2115 requires that foreign corporations conducting more than one-half of their business in California or having more than one-

half of their outstanding voting securities held by California residents to provide *inter alia* for annual election of directors and cumulative voting, despite any applicable out-of-state law to the contrary. Therefore, it appears that even if D.L.M., Inc., were to incorporate under the law of a foreign jurisdiction, it would be subject to California corporations laws.

Mahoney holds promissory notes having a face value of $70,000 which apparently do not become due for three years. Mahoney testified that in the event his plan is not confirmed or his case converted to a Chapter 7, he will resign from Ultronics, which resignation will affect the collectibility of Ultronic's notes. Mahoney currently is the chief financial officer and general manager for Ultronics which is in the commercial satellite system/mini-cable system business.

During Mahoney's cross-examination, Mahoney admitted that there is no specific minimum amount D.L.M., Inc., will pay to unsecured creditors under the plan. At the end of the plan, the assets to be distributed are what they are. In other words, there is no obligation for Mahoney to pay any amount to his creditors under this plan. He merely promises to do his best. Mahoney's inability to assure his creditors that they are going to get more through reorganization than liquidation violates the best interests of the creditor's test under § 1129(a)(7) and therefore, confirmation of the plan must be denied on this ground.

■ 3. *The plan is not feasible because of underestimation of the tax effect of proposed operations:* Chalet objects to confirmation of the plan on the grounds that the debtor has failed to show that confirmation is not likely to be followed by liquidation or the need for further reorganization [§ 1129(a)(11)]. Specifically, Chalet urges that the successor corporation has failed to properly consider the impact of taxes on its projected operations. Indeed, the *pro forma* projection for D.L.M., Inc., show payment of no income tax during the entire five years of operations. Chalet points to two "fallacies" in Mahoney's *pro forma* statements. First, Mahoney intends to have the reorganized debtor D.L.M., Inc., carry forward and deduct the approximate $85,000 in Chapter 11 administrative legal expense he owes individually. Citing Internal Revenue Code

§ 1398(h)(2)(D),[3] Chalet points out that administrative expenses may be deducted only by the estate and that deduction by D.L.M., as a successor entity, will not be permitted. Debtor has not refuted this contention.

Second, Chalet contends that the debtor has not calculated the income tax effect of converting his non-liquid assets to liquid assets by selling them. The debtor counters that the sales transactions are, of course, taxable, but only to the extent that they are sold at a price in excess of the debtor's basis. However, Mahoney has submitted no evidence that all transactions by this reorganized debtor will be exempt from taxation so that the failure to include provision for payment of any income taxes is fatal to the validity of the *pro forma*'s projections.

Accordingly, the objection of Chalet on the grounds of feasibility for failure to properly calculate the effect of income taxes upon the reorganized debtor's operations must be sustained and the plan denied confirmation on this ground.

4. *The debtor's retention of a 15% interest in the assets at the plan's conclusion violates the absolute priority rule contained in 11 U.S.C. § 1129(b)(2)(B)(ii):* Article VI, para. 6.1.A.vi of the plan provides that in addition to the salary Mahoney will receive for his services to D.L.M., Inc.:

> Mr. Mahoney will also receive 15% of the proceeds received upon liquidation of the newly organized debtor if after a five-year period the shareholders elect to liquidate D.L.M., Inc., or cash in that amount if the shareholders elect to continue the existence and organization of D.L.M., Inc.

■ The debtor argues that since all impaired classes, including that of which Chalet is a member, have accepted the debtor's plan, even though Mahoney will receive a

3. Internal Revenue Code § 1398(h)(2)(D) states: (D) Administrative expense deductions allowed only to estate.—The deductions [for administrative expenses allowed under 11 U.S.C. § 503] allowable under this chapter solely by reason of paragraph (1), and the deduction provided by subparagraph (A) of this paragraph, shall be allowable only to the estate.

distribution at the plan's conclusion, the plan is not being "crammed down" on a dissenting class and a § 1129(b)(2)(B)(ii) question is not involved. The debtor is correct in this assertion. Only 24% in number and 7% in amount of class 3 claimants (unsecured creditors) voted against Mahoney's plan. Therefore, the plan has been accepted by Chalet's class [§ 1126(c)] and a § 1129(b)(2)(B)(ii) analysis is not necessary.

 However, acceptance by all unsecured creditors of a plan containing these provisions does not eliminate the need to consider Chalet's objections to this plan provision on other grounds. Counsel for Chalet may be confusing the absolute priority rule objection with that of § 1129(a)(7) which the debtor must meet even when a plan is not being "crammed down". Section 1129(a)(7) requires that each member of an impaired class who has not accepted a plan must receive or retain, on account of its claim, property in an amount which that creditor would receive were the debtor liquidated under Chapter 7. See *In re East,* 57 B.R. 14, 18 fn. 11 (Bankr.M.D.La.1985).

To understand why the debtor's retention of a 15% interest violates § 1129(a)(7)(A)(ii) one must recall Mahoney's admissions concerning his plan. They are that his plan makes no promise to distribute to creditors that which they would receive upon liquidation under Chapter 7; in other words, no minimum distribution is guaranteed. Since Mahoney is to receive 15% of whatever is left, in order to overcome Chalet's objections to his retention of this amount, his plan must at minimum guarantee to objecting creditors distribution of amounts which would have been received upon liquidation under Chapter 7 plus 15% (his retained interest at the plan's conclusion). Since it does not do so, Mahoney's plan must be denied confirmation.

For the above-stated reasons, confirmation of the debtor's plan of reorganization must be denied. Counsel for Chalet is directed to prepare an order in accordance

with this Memorandum Decision within ten (10) days of its date.